[Civ. No. 13495. Second Dist., Div. Three. Nov. 13, 1942.]

HELEN SIGNORELLI, Appellant, v. RAY MILLER, Respondent.

George N. Foster for Appellant.

C. F. Jorz for Respondent.

SCHAUER, P. J.—In an action for damages for personal injuries arising out of an automobile collision, nominal liability of the defendant in favor of plaintiff Helen

Signorelli (hereinafter referred to as plaintiff) was admitted. The case was tried and submitted to a jury on the sole issue of the *amount* of damages. The jury awarded plaintiff $275. Her motion for a new trial was denied. She prosecutes this appeal and states the only question involved, as follows: ''Considering the undisputed evidence of injury presented on behalf of the plaintiff . . . was the verdict and judgment of $275.00 adequate in amount as a matter of law?''

An effectual response to the question is that the record discloses that the evidence of injury to plaintiff is *not undisputed.* On plaintiff's behalf the evidence tended to show that on November 24, 1939, she was sitting in the front seat of her automobile, behind the steering wheel, when her car was struck by defendant's automobile which approached from the rear. Plaintiff testified ''I was hit so hard I was thrown against the wheel and hit my stomach, I was quite large at the time, I was pregnant, I was about five months along, and I hit the wheel and my head was smashed back and my neck was sprained in the back, and my back was terribly sprained, and I started crying.'' Her husband helped her out of the car; she could walk; later he drove her home; she was not ''cut or bruised in any way.'' She said, ''I could feel the baby kicking again, and I felt sure it was all right, and I would see my own doctor later on.'' She testified further that ''a week or two after the accident'' she started vomiting once or twice a day and that such condition persisted until ''two or three weeks'' before delivery of the child on February 21, 1940. She also said that after the accident she was ''terribly nervous and it seemed to affect me so I wanted to sleep all the time. . . . I had to urinate more than I usually had to. . . . I would be able to void, but it would be a very small amount.'' Her back, she said, ''hurt me terribly''; also, she said, she suffered pain in the neck and the child was delivered about five weeks prematurely. On November 16, 1939, eight days prior to the accident, she had been examined by one of her doctors and she was again examined by him on November 30, six days after the accident. Concerning the first of the two mentioned examinations the doctor said that he found conditions ''essentially normal for a woman who has had one previous delivery.'' Of the second examination he testified, ''I found tenderness over the lumbar area of the spine . . .;

also tenderness high in the vagina, I would say in the fornices of the vagina contiguous with the bladder; *that is all.*" This doctor also examined plaintiff on June 19, 1941, and concerning that examination testified, "She still has tenderness on motion in the cervical and lumbar portions of the spine; she has a fourth degree retroverted uterus, which can only be corrected by surgery, and a cystocele which protrudes from the vagina. . . . A cystocele is the out-pouching of the neck of the bladder through the vagina." Concerning his conclusions as to her condition and the cause thereof, the following appears: "Q. . . . From your history of the case and what you found on November 30th, what did you conclude as to the tender conditions? A. Well, I concluded *from the history of the case* that she had an automobile accident, had been injured, and I was apprehensive about whether she would go to term with it, and that she had been injured. Q. That these injuries were from the accident? A. Apparently." (Italics added.)

There was further evidence of a cumulative nature to the same effect as that above related but no useful purpose would be served by reciting it, as enough already has been set forth to require an award larger than $275 *if the jury was bound to conclude that all or a substantial part of the ills or abnormalities mentioned were proximately caused by the accident.* It is upon this point that the case turns.

Plaintiff admitted that she saw her doctor only two or three times between the date of the accident (November 24, 1939) and the date of her child's delivery (February 21, 1940); that she received no bruise as a result of the accident; that she had vomited while carrying a preceding child, *before the accident,* "the first two or three months" after conception; that likewise during such earlier pregnancy she had had backaches "normally"; that after the accident she got no medical treatment for her neck or abdomen; that the length of her stay in the hospital for delivery of the baby *after* the accident was the same as that for delivery of her first baby *preceding* the accident; that the time spent in convalescence in the hospital was the same in each case; that at the time of the accident, in spite of her "terrible shock," she got out of her car and walked around to the back of it to see what damage had been done; that she did not see her doctor "until a week after the accident." To the question "Did you really think you were hurt after

the accident?" she answered, "No, I don't think so." As to an asserted pain in the area of the kidneys she admitted that she had not mentioned it to anyone for "about five or six months" after the accident and that the mention then was to friends, *not* to a doctor.

The doctor who examined plaintiff six days after the accident found her uterus to be "in normal condition"; her "blood pressure and urinalysis normal"; no bruise on her abdomen. Another doctor who was employed by plaintiff in December, 1939, to attend her during her expected confinement, testified that at the time of her first visit to his office she gave no history of having suffered injuries in an accident. He further testified that on examining her (at a later date at which time she told him she had been in an accident) he "found nothing abnormal . . . except . . . she complained some of pain in her back." He prescribed belladonna for "pain in the back and frequency in urination." At the time of delivery an abnormality appeared in the form of "a cystocele." Later he discovered "she had a movable kidney on the right side." As to the essential question of causation he testified, "Cystocele is always caused by a trauma or injury. . . . It would be rather difficult to say that it was absolutely due to this accident. . . . My opinion is it had quite a great deal to do with it *from the history of the case.*" As to the kidney condition the court asked the doctor, "Can you tell from the particular nature of it whether it was due to a nervous condition or to an application of external force?" and the answer was, "Impossible to tell."

On further cross-examination as to the cause of the cystocele the doctor said, in substance, that he meant to testify that cystocele "was caused by trauma" but that he was not prepared to say "that this cystocele . . . was caused by this automobile accident" or that it was due to an accident, and that "cystocele is a very common thing in the delivery of children." In effect the doctor's testimony was that cystocele always relates to some injury as a cause but that such injury may be sustained in childbirth itself just as well as by the application of external force.

On behalf of the defendant a doctor who qualified as a specialist on diseases of the genito-urinary system testified that he had examined plaintiff in March, 1941; that his "findings were all essentially normal, except we found she

had a relaxed vaginal outlet, permitting a pouching down of the bladder into the vagina, and a pouching upward of the vagina when she strained. That was abnormal. We also found she had what is commonly termed as floating kidneys." As to the relation of the accident to her condition he testified, "I was of the opinion the accident she described to me before the examination played no part in the production of the conditions I found her abnormal in." He stated in substance that in his opinion the bladder symptoms she related were due to "an inflammation of the bladder, secondary to the cystocele," and that "the cause of the cystocele and relaxation of the vaginal outlet was secondary to childbirth . . . it was caused by the relaxation of the vaginal outlet as a result of childbirth, allowing those structures to stretch and letting the bladder down into the vagina." Specifically, the following questions and answers appear: "Q. Is that a common condition in childbirth independent of any automobile accident? A. It is. Q. Did you find her suffering from the effects of an injury in an automobile accident of any nature whatsoever? A. I did not." Another doctor, called by the defendant, qualified as a specialist in obstetrics and gynecology. He testified that he had examined plaintiff on September 25, 1940. He stated his findings in some detail and gave as his conclusion the opinion "that none of the pathology afterward could be attributable in any way to any accident she might have had."

Certainly the burden rested on plaintiff to prove by a preponderance of evidence not only that she suffered the ills and abnormalities she claimed, but also that such ills and abnormalities were caused by defendant's automobile's striking her automobile on November 24, 1939. The processes of law, wherein they depend for the ascertainment of facts on the expert knowledge and testimony of medical practitioners, can be no more certain than such testimony. Here such testimony was conflicting. The jurors apparently concluded that most of plaintiff's difficulties arose from a source other than defendant's negligent operation of his automobile. In scrutinizing and construing the evidence we are bound to view its aspects most favorable to sustaining the verdict. (2 Cal. Jur. § 515, p. 880; *Macart* v. *San Joaquin B. & L. Assn.*, (1941) 45 Cal.App.2d 395, 398 [114 P.2d 395]; *Dell* v. *Hjorth*, (1942) 51 Cal.App.2d 576, 578 [125 P.2d 505].) In the light of the conflict of

expert opinion as well as in consideration of all the other circumstances shown, we cannot hold that the evidence fails as a matter of law to support the verdict. ''When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court [or jury].'' (*Crawford* v. *Southern Pacific Co.,* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

The judgment is affirmed. The attempted appeals from the order denying plaintiff's motion for a new trial and from the verdict are dismissed, such order and verdict being non-appealable.

Shinn, J., and Wood (Parker), J., concurred.